# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

KEITH C. HENYARD,

     Petitioner,

     v.                            Case No. 21-CV-839

CHERYL EPLETT,

     Respondent.

## DECISION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DISMISSING CASE

     Keith C. Henyard, a prisoner in Wisconsin custody, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Henyard was convicted of delivery of heroin, delivery of cocaine, possession with intent to deliver heroin, and possession with intent to deliver cocaine, all as a repeat offender. (Habeas Petition at 2, Docket # 1.) Henyard was sentenced to seventeen years, consisting of twelve years of initial confinement followed by five years of extended supervision. (Answer, Ex. A, Judg. of Conviction, Docket # 10-1.) Henyard alleges that his conviction and sentence are unconstitutional. For the reasons stated below, the petition for writ of habeas corpus will be denied and the case dismissed.

## BACKGROUND

     Henyard was charged with four counts of delivering cocaine, one count of possession of cocaine with intent to deliver, two counts of delivering heroin, and one count of possession of heroin with intent to deliver, all as a repeater, in Kenosha County Case No. 2016CF1401. (Habeas Petition at 2.) On December 28, 2016, Henyard appeared in person and with counsel at a hearing before Court Commissioner Frank Parise. (Answer, Ex. B,

*State of Wisconsin v. Henyard*, 2019AP548 (Wis. Ct. App. July 8, 2020), ¶ 3, Docket # 10-2.) At this hearing, Henyard waived his right to a preliminary hearing and, based solely upon the complaint, Commissioner Parise concluded there was probable cause to believe Henyard had committed a felony and bound him over for trial. (*Id.*) In May 2017, Henyard retained Parise, no longer a court commissioner, as counsel in the same case. (*Id.* ¶ 4.) Parise thereafter represented Henyard through his plea and sentencing. (*Id.*)

At an August 7, 2017 pretrial hearing, the circuit court considered increasing Henyard's bond due to the filing of new criminal charges against him. (*Id.* ¶ 5.) Representing Henyard, Parise argued against the bond increase, noting that Henyard had "made every appearance" in the case. (*Id.*) The court nonetheless increased the bond, explaining that it had considered Henyard's good record of appearances, but:

> I'm faced with the fact that he has a history of convictions for violence, although they have been reduced in stature by the district attorney, but he has gone down on convictions for personal violence against women before, and he is accused now while he was out on bond in this case of threatening to kill a woman and battering her and I think breaking a couple of bones, and so I'm very uncomfortable with that, given the severity of the charges, and *there has been some recent publicity about my thoughts about dealing heroin, too, so that—that would give the defendant an additional incentive to fail to appear* . . . .

(*Id.* ¶ 5 (emphasis added).) A plea deal was eventually struck, and Henyard pled to one count each of delivery of cocaine, delivery of heroin, possession of cocaine with intent to deliver, and possession of heroin with intent to deliver, all as a repeater, with the other four counts being dismissed but read in. (*Id.* ¶ 6.) Henyard was sentenced on the delivery of heroin count to twelve years of initial confinement followed by five years of extended supervision. (*Id.*) On the remaining three counts, the court withheld sentence and ordered probation. (*Id.*)

2

As part of its explanation for the sentence, the judge began by referencing a report from a medical examiner in Milwaukee County indicating that in a recent four-day period, eleven people died from heroin overdoses. (*Id.* ¶ 7.) The judge stated that "we have got a lot of heroin out on the streets" and that there is "an economic incentive for people to traffic in this stuff," so there "needs to be a message loud and clear about how unacceptable this kind of behavior is." (*Id.*) The judge explained it as "simple economics," that if an activity carries the risk of a severe penalty and the law is aggressively enforced, then the activity is "not worth the risk." (*Id.*) The judge used as an example the country of Singapore, which he stated was "one of the safest places in the world" because "people who are actually selling drugs suffer the death penalty." (*Id.*) The judge expressed concern for "the number of people who lose their lives to heroin overdoses" and told Henyard that he "had to pay the price for this to be an example to you and to people who know you, to your friends, to people who causally know you, your customers, your providers." (*Id.* ¶ 8.) The judge further added that Henyard's case was "aggravated" because "he was a woman beater, too" and had $80,000 in child support arrearage, which he called "disgraceful." (*Id.*)

Following sentencing, Henyard filed a postconviction motion seeking plea withdrawal or alternatively, for resentencing. (*Id.* ¶ 9.) As to plea withdrawal, Henyard argued Parise ineffectively represented him because Parise had a conflict of interest during the representation due to earlier serving as a court commissioner in the case. (*Id.*) In his role as court commissioner, Parise presided over Henyard's preliminary hearing waiver, finding probable cause to believe he committed a felony and binding him over for trial. (*Id.*) As to

3

his request for resentencing, Henyard argued that the sentencing judge was biased against "defendants like him" who are convicted of delivering heroin or other drugs. (*Id.*)

Parise testified at the postconviction hearing. (*Id.* ¶ 10.) He testified that when he met and began representing Henyard in May 2017 that he did not recognize Henyard "at all"; that he believed he had done a conflict check before agreeing to represent Henyard but did not "catch" that he had presided over the December 28, 2016 hearing; and that he did not become aware that he had presided over that hearing until he received a letter from Henyard's postconviction counsel in August 2018, one year after Henyard entered his plea. (*Id.*) When the circuit court asked postconviction counsel how Parise's representation was compromised, counsel responded, "Well, I don't know that I can say specifically." (*Id.*) The circuit court found that while Parise's representation of Henyard in the same case in which he had previously served as a court commissioner "shouldn't have happened" and that Parise had "made a mistake," it found that "there is absolutely no reason to believe there has been any compromise of [Henyard's] interests . . . they have not been in any way affected." (*Id.* ¶ 11.)

In support of his request for resentencing, Henyard submitted local newspaper articles related to comments the sentencing judge purportedly made at the sentencing hearings of other defendants prior to Henyard's August 7, 2017 pretrial hearing. (*Id.* ¶ 12.) The crux of these articles expressed the judge's belief, as he stated at Henyard's hearing, that long prison sentences deter others from selling heroin and discussing the effectiveness of Singapore's death penalty policy in drug trafficking cases. (*Id.*) The articles identified this judge as stating that the key to addressing the growing opiate problem and drug problems in

4

general was to put more people in prison and to fight the war on drugs more aggressively. (*Id.*) Postconviction counsel clarified that Henyard was not arguing that this judge was biased in all heroin and drug cases; rather, that the statement he made at the August 7 hearing regarding the "recent publicity" he received demonstrated the judge exhibited bias against Henyard specifically. (*Id.* ¶ 13.)

The circuit court judge denied Henyard's resentencing motion, finding that he is tasked with putting reasons on the record for the sentence imposed and that he is permitted to consider the danger caused by selling drugs. (*Id.* ¶ 14.) He further found that the law requires him to put on the record the reasons why he changes people's bonds and that the recent articles expressing the judge's opinions might "give someone incentive to blow town." (*Id.*)

Henyard appealed the denial of his postconviction motion, again raising the issues of ineffective assistance of counsel and judicial bias. The court of appeals affirmed the circuit court's dismissal of Henyard's postconviction motion and the judgment of conviction (Docket # 10-2); notwithstanding a scathing dissent penned by Wisconsin Court of Appeals Presiding Judge Reilly regarding Henyard's ineffective assistance of counsel claim (*Id.* ¶¶ 37–47). The Wisconsin Supreme Court denied Henyard's petition for review on January 20, 2021. (Answer, Ex. C, Docket # 10-3.) Henyard timely filed a petition for habeas relief in this Court on July 13, 2021. (Docket # 1.)

## STANDARD OF REVIEW

Henyard's petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a writ of habeas corpus may be granted if the state court

Case 2:21-cv-00839-NJ   Filed 10/19/22   Page 5 of 22   Document 15

decision on the merits of the petitioner's claim (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

A state court's decision is "contrary to . . . clearly established Federal law as established by the United States Supreme Court" if it is "substantially different from relevant [Supreme Court] precedent." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). The court of appeals for this circuit recognized the narrow application of the "contrary to" clause:

> [U]nder the "contrary to" clause of § 2254(d)(1), [a court] could grant a writ of habeas corpus . . . where the state court applied a rule that contradicts the governing law as expounded in Supreme Court cases or where the state court confronts facts materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result.

*Washington*, 219 F.3d at 628. The court further explained that the "unreasonable application of" clause was broader and "allows a federal habeas court to grant habeas relief whenever the state court 'unreasonably applied [a clearly established] principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 413).

To be unreasonable, a state court ruling must be more than simply "erroneous" and perhaps more than "clearly erroneous." *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997). Under the "unreasonableness" standard, a state court's decision will stand "if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 748–49 (7th Cir. 1997). In *Morgan v. Krenke*, the court explained that:

6

Unreasonableness is judged by an objective standard, and under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

232 F.3d 562, 565–66 (7th Cir. 2000) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 532 U.S. 951 (2001). Accordingly, before a court may issue a writ of habeas corpus, it must determine that the state court decision was both incorrect and unreasonable. *Washington*, 219 F.3d at 627.

## ANALYSIS

Henyard raises two grounds for relief in his habeas petition: (1) that he was denied effective assistance of counsel due to the conflict of interest created by his defense counsel having previously presided over a hearing in his case as a court commissioner and (2) that his right to due process was violated when he was sentenced by a biased judge. I will address each ground in turn.

### 1. Ineffective Assistance of Trial Counsel

#### 1.1 Legal Standard

The clearly established Supreme Court precedent for ineffective assistance of counsel claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Generally, to establish a Sixth Amendment violation under *Strickland*, a defendant must establish two prongs: one, that counsel's performance was deficient and two, that the deficient performance prejudiced the defense. *Id.* at 687. The *Strickland* Court, however, articulated an exception to this general rule, stating that "[i]n certain Sixth Amendment contexts, prejudice is presumed." *Id.* at 692. The *Strickland* Court articulated several such exceptions where prejudice is

7

presumed, including "actual or constructive denial of the assistance of counsel altogether" and "various kinds of state inference with counsel's assistance." *Id.*

The *Strickland* Court also noted that "[o]ne type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice." *Id.* Citing its previous decision in *Cuyler v. Sullivan*, 446 U.S. 335 (1980), the Court found that "prejudice is presumed when counsel is burdened by an actual conflict of interest." *Id.* (citing *Sullivan*, 446 U.S. at 345–50). The Court explained, however, that despite the reasonableness of the criminal justice system to "maintain a fairly rigid rule of presumed prejudice for conflicts of interest," the "rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above." *Id.* Rather, "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* (quoting *Sullivan*, 446 U.S. at 348, 350).

Approximately twenty years ago, the Supreme Court again looked at the issue of ineffective assistance of counsel in the context of attorney conflicts of interest. *See Mickens v. Taylor*, 535 U.S. 162 (2002). In *Mickens*, the Court was tasked with determining "what a defendant must show in order to demonstrate a Sixth Amendment violation where the trial court fails to inquire into a potential conflict of interest about which it knew or reasonably should have known." *Id.* at 164. The *Mickens* Court examined several of its prior cases to determine "whether the principle established by these cases provides an exception to the general rule of *Strickland* under the circumstances of the present case." *Id.* at 166–67.

8

The Court started with *Holloway v. Arkansas*, 435 U.S. 475 (1978), a case in which defense counsel had objected that he could not adequately represent the divergent interests of three codefendants. *Id.* at 167 (citing *Holloway*, 435 U.S. at 478–80). The *Holloway* Court found that joint representation of conflicting interests is inherently suspect "because counsel's conflicting obligations to multiple defendants 'effectively sea[l] his lips on crucial matters' and make it difficult to measure the precise harm arising from counsel's errors." *Id.* at 168 (quoting *Holloway*, 435 U.S. at 489–90). As such, the *Mickens* Court noted that *Holloway* "creates an automatic reversal rule only where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict." *Id.*

The *Mickens* Court next considered *Sullivan*. *Id.* In *Sullivan*, the respondent was one of three defendants accused of murder who were tried separately, represented by the same counsel. *Id.* (citing *Sullivan*, 446 U.S. at 347–48). Neither counsel nor anyone else objected to the multiple representation, and counsel's opening argument at Sullivan's trial suggested that the interests of the defendants were aligned. *Id.* Thus, the Court declined to extend *Holloway*'s "automatic reversal rule" to Sullivan's situation and held that, "absent objection, a defendant must demonstrate that 'a conflict of interest actually affected the adequacy of his representation.'" *Id.* (quoting *Sullivan*, 446 U.S. at 348–49). In addition to describing the defendant's burden of proof, *Sullivan* separately addressed "a trial court's duty to inquire into the propriety of a multiple representation, construing *Holloway* to require inquiry only when 'the trial court knows or reasonably should know that a particular conflict exists.'" *Id.* (quoting *Sullivan*, 446 U.S. at 347).

9

Finally, the *Mickens* Court considered its previous decision in *Wood v. Georgia*, 450 U.S. 261 (1981), a case where three defendants who were convicted of distributing obscene materials had their probation revoked for failure to make the requisite $500 monthly payments on their $5,000 fines. *Id.* at 169. The Court recounted "certain disturbing circumstances" that came to the Court's attention. *Id.* Specifically:

> At the probation-revocation hearing (as at all times since their arrest) the defendants had been represented by the lawyer for their employer (the owner of the business that purveyed the obscenity), and their employer paid the attorney's fees. The employer had promised his employees he would pay their fines, and had generally kept that promise but had not done so in these defendants' case. This record suggested that the employer's interest in establishing a favorable equal-protection precedent (reducing the fines he would have to pay for his indigent employees in the future) diverged from the defendants' interest in obtaining leniency or paying lesser fines to avoid imprisonment.

*Id.* The Court further noted that the "possibility that counsel was actively representing the conflicting interests of employer and defendants 'was sufficiently apparent at the time of the revocation hearing to impose upon the court a duty to inquire further.'" *Id.* (quoting *Wood*, 450 U.S. at 272). The *Wood* Court remanded the case for the trial court to determine whether the conflict of interest actually existed as the record strongly suggested. *Id.* at 170 (citing *Wood*, 450 U.S. at 273).

Turning, then, back to the case before it, the *Mickens* Court stated that petitioner argued that *Wood* established an "unambiguous rule" that where the trial judge neglects a duty to inquire into a potential conflict, the defendant, to obtain reversal of the judgment, need only show that his lawyer was subject to a conflict of interest, and need not show that the conflict adversely affected counsel's performance. *Id.* The petitioner relied on the remand instruction that directed the trial court to determine whether "an actual conflict of

10

interest existed" but did not instruct it to determine whether the conflict adversely affected counsel's performance. *Id.* at 171.

The *Mickens* Court rejected petitioner's interpretation of *Wood*. The Court found that "an actual conflict of interest" meant "precisely a conflict *that affected counsel's performance*— as opposed to a mere theoretical division of loyalties." *Id.* (emphasis in original). The Court explained that:

> Petitioner's proposed rule of automatic reversal when there existed a conflict that did not affect counsel's performance, but the trial judge failed to make the *Sullivan*-mandated inquiry, makes little policy sense. As discussed, the rule applied when the trial judge is not aware of the conflict (and thus not obligated to inquire) is that prejudice will be presumed only if the conflict has significantly affected counsel's performance—thereby rendering the verdict unreliable, even though *Strickland* prejudice cannot be shown. *See Sullivan*, *supra,* at 348–349, 100 S. Ct. 1708. The trial court's awareness of a potential conflict neither renders it more likely that counsel's performance was significantly affected nor in any other way renders the verdict unreliable. *Cf. United States v. Cronic*, 466 U.S., at 662, n. 31, 104 S. Ct. 2039. Nor does the trial judge's failure to make the *Sullivan*-mandated inquiry often make it harder for reviewing courts to determine conflict and effect, particularly since those courts may rely on evidence and testimony whose importance only becomes established at the trial.

*Id.* at 172–73. The Court explained that while Courts of Appeals have "applied *Sullivan* 'unblinkingly' to 'all kinds of alleged attorney ethical conflicts,'" the "language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application." *Id.* at 174–75. *Mickens* clarifies that *Sullivan* holds that until "a defendant shows that his counsel *actively represented* conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Id.* at 175 (quoting *Sullivan*, 446 U.S. at 350) (emphasis added by *Mickens* Court). The *Mickens* Court states that while *Holloway* and *Sullivan* specifically stressed the high probability of prejudice arising from multiple concurrent

11

representation and the difficulty of proving prejudice, "[n]ot all attorney conflicts present comparable difficulties." *Id.*

### 1.2 The Wisconsin Court of Appeals' Decision

The Wisconsin Court of Appeals began its analysis of Henyard's claim by acknowledging that the Sixth Amendment right to the effective assistance of counsel includes the right to representation free from conflicts of interest. (Docket # 10-2 at ¶ 16.) The court of appeals found that a defendant who fails to raise an objection to counsel's representation during his criminal proceedings "must demonstrate by clear and convincing evidence that his counsel was actively representing a conflicting interest, so that the attorney's performance was adversely affected." (*Id.* (quoting *State v. Love*, 227 Wis. 2d 60, 71, 594 N.W.2d 806 (1999).)

The court of appeals noted that Henyard could not clearly articulate exactly how Parise's interests were actually conflicted by serving as court commissioner at the December 28, 2016 hearing and then later serving as defense counsel in the same case. (*Id.* ¶ 17.) Again, when the circuit court asked postconviction counsel how Parise's representation was compromised, counsel responded, "Well, I don't know that I can say specifically." (*Id.* ¶ 10.) Henyard suggested that because Parise, while serving as court commissioner, made a probable cause finding and bound Henyard over for trial, that Parise then had an incentive while serving as defense counsel to have Henyard found guilty, so as to prove correct his earlier probable cause finding and bind over decision. (*Id.* at ¶ 17.)

The court of appeals rejected this argument and found that Henyard failed to demonstrate that Parise had an actual conflict that adversely affected his representation. (*Id.*

12

¶ 19.) The court accepted Parise's testimony at the postconviction hearing that he had no recollection or other awareness that he had previously served as court commissioner at the December 2016 hearing and that he made a mistake in missing the conflict. (*Id.* ¶ 18.) The court concluded that Henyard failed to show that anything Parise did or failed to do during his representation of Henyard could have been due to Parise having earlier presided over Henyard's preliminary hearing waiver, probable cause finding, and binding over for trial, when Parise was unaware that he had done any of those things. (*Id.* ¶ 25.) The court of appeals concluded that Henyard provided no factual basis to conclude that Parise's act of presiding over the December 2016 hearing in any way compromised his representation of Henyard. (*Id.*)

Presiding Judge Reilly wrote a scathing dissent. He noted that Wisconsin Supreme Court Rule 20:1.12(a) prohibits a lawyer from representing anyone in connection with a matter in which the lawyer participated personally and substantially as a judge or other adjudicative officer. (*Id.* ¶ 37.) The comment to SCR 20:1.12(a) provides that the conflict created by this situation is not subject to waiver by consent of the parties involved. (*Id.*) Judge Reilly reasoned that because a conflict created under SCR 20:1.12(a) is non-waivable, it necessarily adversely affected Henyard. (*Id.* ¶ 44.) He states that "a judge who makes a substantive ruling and then sells his services as a defense lawyer to the defendant he just presided over has created an actual conflict," and because "Parise's violation of a Supreme Court Rule created an actual conflict of interest that adversely affected his performance, [ ] prejudice is presumed." (*Id.* ¶¶ 43–44.) Judge Reilly reasoned that "Parise's violation of the

integrity of our judicial system is an act that 'adversely affected' Henyard's representation."
(*Id.* ¶ 44.)

### 1.3 Habeas Review

Henyard argues that the Wisconsin Court of Appeals' decision finding that Attorney Parise did not have an "actual conflict of interest" warranting automatic reversal contravenes *Strickland* and *Mickens*. (Docket # 11 at 3–4.) Henyard argues that his case is different from *Mickens* because in *Mickens* there was only a *potential* conflict of interest whereas in Henyard's case there was an *actual* conflict of interest. (*Id.* at 4.) In his reply brief, following Judge Reilly's reasoning in the court of appeals' dissent, Henyard argues that "an actual conflict of interest existed and it couldn't be more clear that the Court of Appeals was wrong when it concluded otherwise. As a judge who makes a substantial ruling, and then sells ones services as a defense lawyer to a defendant he just presided over, has created an actual conflict." (Docket # 14 at 6.)

Henyard's argument, however, misreads the Supreme Court's definition of an "actual conflict of interest." Again, the *Mickens* Court defines an "actual conflict of interest" as "a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." 535 U.S. at 171 (emphasis in original). In other words, if the conflict of interest *did not* affect counsel's performance, then it is not an "actual conflict of interest." The *Mickens* Court makes clear that the "purpose of our *Holloway* and *Sullivan* exceptions from the ordinary requirements of *Strickland* [ ] is not to enforce the Canons of Legal Ethics." *Id.* at 176.

Henyard, however, argues that if an attorney has an unwaivable conflict of interest, then he necessarily has an "actual conflict of interest." Specifically, Henyard follows Judge Reilly's rationale that if an attorney has an unwaivable conflict of interest, it necessarily affects counsel's performance. (Petitioner's Reply Br. at 2–5, Docket # 14.) But the *Mickens* Court created no such *per se* rule. In fact, the *Mickens* Court specifically states that the language of its decision in *Sullivan* "does not clearly establish, or indeed even support," the Courts of Appeals' expansive application of the *Sullivan* rationale to "all kinds of alleged attorney ethical conflicts." 535 U.S. at 174–75. The Court noted that while *Sullivan* and *Holloway* "stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice," it found that "[n]ot all attorney conflicts present comparable difficulties." *Id.* at 175. The Court specifically stated that it was not ruling on whether the "*Sullivan* prophylaxis" should be extended to other situations of attorney conflict of interests. *Id.* at 176.

While I share Judge Reilley's concerns about the former court commissioner's representation of Henyard, given the Supreme Court's precedent, Henyard's argument that the Wisconsin Court of Appeals contravened clearly established Supreme Court law fails. The Court has not established that Henyard's situation—in which counsel had an unwaivable conflict due to previously serving as a judicial officer in the case—falls into *Holloway*'s automatic reversal rule. As such, under *Mickens*, to have an "actual conflict of interest" equating to deficient performance and relieving him of proving *Strickland* prejudice, Henyard must show that the conflict of interest actually affected counsel's performance. The court of appeals determined that it did not, and Henyard fails to demonstrate that this

15

decision either contravenes established Supreme Court law or unreasonably determined the facts in light of the evidence presented. For these reasons, Henyard is not entitled to habeas relief on this ground.

2.      *Judicial Bias at Sentencing*

Henyard further argues that the Wisconsin Court of Appeals erred in finding that he failed to rebut the presumption that the sentencing judge acted in a manner that was fair, impartial, and without prejudice. (Docket # 11 at 5–7.) "A fair hearing before a fair and unbiased adjudicator is a basic requirement of due process under the Fourteenth Amendment." *Alston v. Smith*, 840 F.3d 363, 368 (7th Cir. 2016) (citing *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)). "Due process is violated not only where an adjudicator is biased in fact, but also where a situation presents a particularly high probability of bias." *Id.* The inquiry is objective. *Id.* The question is "'whether the average judge in [this] position is 'likely' to be neutral, or whether there is in [sic] unconstitutional 'potential for bias'[;] . . . [t]he facts showing a probability of bias must be strong enough to 'overcome a presumption of honesty and integrity in those serving as adjudicators.'" *Id.* at 368 (internal citations omitted).

In rendering its decision, the Wisconsin Court of Appeals, citing *State v. Herrmann*, 2015 WI 84, ¶ 3, 364 Wis. 2d 336, 867 N.W.2d 772, found that a judge is presumed to have acted fairly, impartially, and without prejudice; however, when a defendant shows there is actual bias by a judge or the appearance of bias reveals a great risk of actual bias, the presumption of impartiality is rebutted and a due process violation occurs. (Docket # 10-2 at ¶ 26.)

16

Henyard argued to the court of appeals that his sentencing judge was biased against defendants, like Henyard, convicted of delivering heroin and other drugs based on local newspaper articles which discuss sentencing comments the judge made in other cases. (*Id.* ¶ 27.) In these articles, the sentencing judge is identified as stating that people:

> [W]ho commit the "grave crime" of first-degree reckless homicide for delivering drugs which caused someone's death "have to suffer severe loss," "the key to addressing the growing opiate problem—and drug problems in general—is to put more people in prison," "the war on drugs needs to be fought more aggressively," and "I pray to God that it will and that lives will be saved"; indicating he "believed that long prison sentences can deter others from selling heroin"; and showing admiration for the effectiveness of Singapore's policy of applying the death penalty to drug dealers.

(*Id.*) Henyard argued that these statements show that the judge's sentencing position in every drug delivery case was "eminently clear." (*Id.*) Henyard further argued that the August 7, 2017 hearing in which the judge increased his bond due in part to the "recent publicity" about the judge's thoughts on dealing heroin and the judge's concern that these thoughts would give Henyard an additional incentive to fail to appear, gave not only the appearance of bias, but amounted to actual bias. (*Id.*) Henyard argued that the comments made at the August hearing showed that the court would act consistent with its personal desire to sentence drug offenders to lengthy prison sentences. (*Id.*)

In rejecting Henyard's argument for judicial bias, the court of appeals found that the sentencing judge's statements at Henyard's sentencing, though similar to comments reported in the newspaper articles, were general statements on his view of the gravity of the crime of delivering heroin and other drugs and the importance of protecting the public by deterring future crimes of this nature. (*Id.* ¶ 30.) The court of appeals found that this "is no different than the expressions heard every day by courts throughout the country that

17

murders, rapes, child molestations, etc., are some of the most serious crimes and warrant stern sentences," and the supreme court has stated that protection of the public and future deterrence are key factors a court should consider in meting out a sentence. (*Id.*) The court of appeals found that the sentencing judge's comments in the newspaper articles expressed his general belief as to the importance of deterring drug dealing to protect the public and made no prejudgment as to Henyard's case. (*Id.* ¶ 33.) The court of appeals further considered the fact that at Henyard's sentencing hearing, the judge considered the significance of Henyard's repeated crimes of delivering heroin and cocaine; Henyard's character in that he also had $80,000 in child support arrearage and a significant criminal record, including a history of being a "woman beater"; and the need to protect the public by deterring Henyard and others who would consider delivering illegal drugs. (*Id.* ¶ 31.)

As for the judge's comments at the August hearing, specifically the sentence "there has been some recent publicity about my thoughts about dealing heroin, too, so that . . . would give the defendant an additional incentive to fail to appear . . ." (*id.* ¶ 34), the court of appeals found that the comment was an explanation of the judge's concern as to what Henyard might think how the judge might act, it was not a comment as to what the judge planned to do at sentencing (*id.* ¶ 35). The court of appeals further found that Wisconsin law required "much more specificity" than general comments about viewing certain crimes as deserving of stern sentences; there must be comments that amount to an actual promise to order a specific sentence. (*Id.*) Finding that Henyard failed to meet his burden, the court of appeals affirmed the judgment.

18

On habeas review, Henyard's brief is completely devoid of argument as to how the court of appeals' decision contravened established Supreme Court law or unreasonably determined the facts in light of the evidence presented. (Docket # 11 at 5–7, Docket # 14 at 6–8.) Rather, Henyard makes the conclusory statement that the "state court's determination that actual bias was not present is an unreasonable application of clearly established federal law as held in *Caperton*." (Docket # 11 at 7.)

But *Caperton* does not support Henyard's position. In *Caperton*, 556 U.S. 868 (2009), a West Virginia jury returned a verdict that found A.T. Massey Coal Co. and its affiliates liable for fraudulent misrepresentation, concealment, and tortious interference with existing contractual relations. *Id.* at 872. The jury awarded Hugh Caperton, Harman Development Corp., Harman Mining Corp., and Sovereign Coal Sales (collectively "Caperton") the sum of $50 million in compensatory and punitive damages. *Id.* Don Blankenship was Massey's chairman, chief executive officer, and president. *Id.* at 873. After the verdict but before the appeal, West Virginia held its 2004 judicial elections. *Id.* Knowing the Supreme Court of Appeals of West Virginia would consider the appeal in the case, Blankenship decided to support an attorney who sought to replace Justice McGraw. Justice McGraw was a candidate for reelection to that court. The attorney who sought to replace him was Brent Benjamin. *Id.*

In addition to contributing the $1,000 statutory maximum to Benjamin's campaign committee, Blankenship donated almost $2.5 million to an organization who opposed McGraw and supported Benjamin. *Id.* Blankenship additionally spent just over $500,000 on independent expenditures—for direct mailings and letters soliciting donations as well as

Case 2:21-cv-00839-NJ   Filed 10/19/22   Page 19 of 22   Document 15

television and newspaper advertisements—to support Benjamin. *Id.* Benjamin won the election. *Id.*

Before Massey filed its petition for appeal, Caperton moved to disqualify now-Justice Benjamin under the due process clause and West Virginia law. *Id.* at 874. Justice Benjamin denied the motion. *Id.* The West Virginia court of appeals reversed the $50 million verdict against Massey. *Id.* The Supreme Court, in considering this case, found that:

> Not every campaign contribution by a litigant or attorney creates a probability of bias that requires a judge's recusal, but this is an exceptional case. . . . We conclude that there is a serious risk of actual bias—based on objective and reasonable perceptions—when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent.

*Id.* at 884. The *Caperton* Court made clear that it was on "these extreme facts" that "the probability of actual bias rises to an unconstitutional level," and noted that this decision addressed "an extraordinary situation where the Constitution requires recusal." *Id.* at 887–88. The Court found that "Blankenship's significant and disproportionate influence—coupled with the temporal relationship between the election and the pending case—offer[s] a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true." *Id.* at 886 (internal quotations and citations omitted).

It is unclear how the Wisconsin Court of Appeals' decision in Henyard's case contravenes the Supreme Court's decision in *Caperton*. The *Caperton* Court specifically stated that:

> It is true that extreme cases often test the bounds of established legal principles, and sometimes no administrable standard may be available to address the perceived wrong. But it is also true that extreme cases are more

20

likely to cross constitutional limits, requiring this Court's intervention and formulation of objective standards.

*Id.* at 887. Henyard has not shown that the court of appeals' determination that the sentencing judge's statements in the press amounted to anything more than general statements regarding the gravity of the crime of delivering heroin and other drugs and the importance of protecting the public by deterring future crimes of this nature—both proper factors in considering a sentence—was incorrect. Nor has Henyard shown that the court of appeals unreasonably applied the facts in finding that the sentencing judge was neither actually biased, nor gave the appearance of objective bias. For these reasons, Henyard is not entitled to habeas relief on this ground.

## CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing § 2254 Cases, the court must issue or deny a certificate of appealability "when it enters a final order adverse to the applicant." A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 and n.4).

Jurists of reason would not find it debatable that Henyard is not entitled to habeas relief. Thus, I will deny Henyard a certificate of appealability. Of course, Henyard retains

the right to seek a certificate of appealability from the Court of Appeals pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the petitioner's petition for a writ of habeas corpus (Docket # 1) be and hereby is **DENIED**.

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**.

**IT IS ALSO ORDERED** that a certificate of appealability shall not issue.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 19th day of October 2022.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge